UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jose Robles,<br><br>          Plaintiff,<br><br>— against —<br><br>Medisys Health Network, Inc.; John Does 1–10; and Jane Roes 1–10,<br><br>          Defendants. | **19-cv-6651 (ARR) (RML)**<br><br><br><br>**Opinion & Order** |

ROSS, United States District Judge:

The plaintiff, Jose Robles, brings this action against defendant Medisys Health Network, Inc. d/b/a Jamaica Hospital Medical Center ("the Hospital," "Jamaica Hospital," or "Medisys"), along with ten John Doe and ten Jane Roe defendants. In his First Amended Complaint, the plaintiff alleges claims under the Americans with Disabilities Act and the Family and Medical Leave Act, as well as claims under state and local law. The Hospital moves to dismiss the claims asserted against it pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Hospital's motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Jose Robles, alleges that defendant Medisys operates Jamaica Hospital in Queens, New York. First Am. Compl. ¶ 9, ECF No. 15 ("FAC"). Medisys is a not-for-profit corporation that employs more than fifty people on a full-time or full-time-equivalent basis. *Id.* ¶¶ 8, 10. Robles worked full time at Jamaica Hospital as a Patient Navigator—responsible for arranging follow-up appointments for patients—from approximately April 2017 until November 5, 2018, when the Hospital fired him. *See id.* ¶¶ 8–9, 15–18.

Jamaica Hospital also happened to be the local hospital serving Robles's community, and Robles himself received treatment there. *See id.* ¶ 11. In particular, in May 2018, Robles experienced "mental health related symptoms." *Id.* ¶ 23. He was hospitalized at Jamaica Hospital for approximately one week and was diagnosed with bipolar disorder. *Id.* The Hospital granted Robles time off from work so that he could undergo treatment during that week; therefore, Robles believes that the Hospital must have learned of his "medical condition" at that time. *Id.* ¶ 24.

Notwithstanding his week-long hospitalization in May 2018, Robles remained "able to perform the essential functions of his job, without accommodation" until his mental health symptoms worsened on October 27, 2018. *Id.* ¶ 21. On that date, the adult daughter of Robles's live-in girlfriend died suddenly in a "domestic violence incident that caused her to suffer a brain aneurism." *Id.* ¶ 26. This death was traumatic for Robles, and, as a result, he "immediately began to experience severe mental health symptoms associated with depression, anxiety, and bi-polar disorder." *Id.* ¶ 29. Accordingly, on that same day, he requested leave from work. *Id.* ¶ 30. He asserts that this leave "qualified as FMLA[1] leave[.]" *Id.* The Hospital granted his request for leave, with Robles scheduled to return to work on November 5, 2018. *Id.* ¶ 31.

Robles's symptoms continued to worsen during his leave. On November 2, 2018, he attended his girlfriend's daughter's funeral. *See id.* ¶¶ 32–33. He experienced trauma and grief, which "further exa[cerbated]" his "symptoms." *Id.* ¶ 33. He became "unable to concentrate" and "had extreme difficulties breathing," and he became "incapacitated in a manner that disabled him from handling major life activities. As such, he was unable to work until his condition was stabilized through further treatment." *Id.* ¶ 34. "While [Robles's] symptoms were severely exa[cerbated] by the recent trauma, his underlying conditions were not temporary or a mere

---

[1] "FMLA" stands for the Family and Medical Leave Act, 29 U.S.C. §§ 2601–2654.

impairment." *Id.* ¶ 35.

The next day, Robles "suffered a mental breakdown and was found lying in the street." *Id.* ¶ 36. An ambulance brought him to the emergency room at Jamaica Hospital, where he received treatment "for intoxication, depression, and bipolar disorder." *Id.* He received medication and stayed in the emergency room overnight, from November 3 until November 4, 2018. *Id.* ¶ 37.[2]

During Robles's emergency room stay, his girlfriend also underwent treatment at Jamaica Hospital, for depression. *Id.* ¶ 38. Robles wanted to see his girlfriend, but a nurse refused to allow him to do so. *Id.* ¶ 39. Robles then "got into a verbal altercation with" this nurse. *Id.* ¶ 40.

On November 5, 2018—the day that Robles was scheduled to return to work—a human resources representative for Jamaica Hospital called Robles and told him "that he was terminated from his job 'due to events over the weekend.'" *Id.* ¶¶ 31, 45. When Robles asked what those events were, the representative responded that "we are not going to discuss that." *Id.* ¶ 46. Robles believes that the representative "was referencing [his] hospitalization, as no other relevant events occurred during the prior weekend." *Id.* ¶ 47. Robles told the human resources representative that "his supervisors and co-workers knew that he requested leave because of the exa[cerbation] of his mental health symptoms due [to ]the death of his partner's daughter." *Id.* ¶ 48. Robles asked to

---

[2] Actually, the FAC states that Robles's release from the hospital occurred on November 4, 2019. FAC ¶ 37. However, the year "2019" appears to be a typographical error, as Robles alleges that he went to the hospital on November 3, 2018, and remained there "overnight . . . until he was released[.]" *Id.* ¶¶ 36–37. Robles also alleges that he remained in the emergency room during his overnight stay, which would not be consistent with a year-long hospitalization. *Id.* ¶ 37. Subsequent allegations in the FAC also imply that Robles's hospitalization lasted only one night—and not one year. *See id.* ¶¶ 45–47 (alleging that Robles's employer fired him "due to events over the weekend" and that such "events" referenced his hospitalization). Therefore, I assume that Robles's release from the hospital occurred on November 4, 2018, and not in 2019. Because I am allowing Robles to amend the claims that I am dismissing, as discussed below, this assumption is not prejudicial to him. If Robles does amend the FAC, he is instructed to either fix this typographical error or notify me that it is not, in fact, an error.

speak with his supervisors so that he could explain his medical condition and "the events that occurred." *Id.* ¶ 50. The representative "refused to give [Robles] permission to speak to anyone else regarding his termination, his condition, or events associated with his hospitalization." *Id.* ¶ 51. Robles "subsequently received a letter from Defendants stating that he would be arrested if he was found on the premises of Jamaica Hospital." *Id.* ¶ 52.

On the day of his firing, the Hospital knew that Robles had depression and bipolar disorder and that he was "disabled within the meaning of the ADA[.]"[3] *Id.* ¶¶ 62–63. However, neither the human resources representative nor any other Hospital representative "attempted to engage with [Robles] to determine if he could be accommodated or to offer him additional FMLA leave." *Id.* ¶ 53. Nor did the Hospital ever inform Robles of his rights under the ADA or the FMLA. *Id.* ¶¶ 64–65. If the Hospital had given Robles "a reasonable accommodation of additional leave"—which "would have been a definite period of time"—Robles "would have been able to treat the symptoms of his mental health conditions in a manner that would have enabled him to return to work and perform the essential functions of his job." *Id.* ¶¶ 54–55. Robles was later—on an unspecified date—"readmitted to Jamaica Hospital for treatment." *Id.* ¶ 56.

The only way that Robles's supervisors could have learned about his verbal altercation with the nurse would have been by "obtaining his records or being directly informed by staff" members who gave medical care to Robles during his November hospitalization. *Id.* ¶ 44. Robles alleges this fact based on his belief that "the only potential witnesses" to the altercation were care providers; Robles's supervisors themselves could not have witnessed the altercation, and Robles did not inform his coworkers or any other hospital staff members about it. *Id.* ¶¶ 41–43. Accordingly, Doe and Roe defendants 1–5 must have "transmitted confidential information

---

[3] The Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213.

pertaining to [Robles's] treatment for medical and psychiatric conditions" to Doe and Roe defendants 6–10 "for the purpose of, and with the foreseeable consequence of, using that information as grounds for terminating [Robles] from his position as a Patient Navigator at Jamaica Hospital." *Id.* ¶ 59.

Robles filed his Complaint in this case in November 2019. *See* Compl., ECF No. 1. After the Hospital requested a pre-motion conference in anticipation of bringing a motion to dismiss, Robles amended the complaint. *See* Letter, Feb. 3, 2020, ECF No. 10; FAC. The First Amended Complaint asserts eight causes of action. In the first cause of action, Robles alleges that the Hospital discriminated against him, failed to accommodate his disability, and retaliated against him in violation of the ADA and that the Hospital impermissibly engaged in interference, coercion, or intimidation with respect to his ADA-protected rights. *See* FAC ¶¶ 69–76. In the second cause of action, Robles alleges that the Hospital interfered with the exercise of his rights under the FMLA and retaliated against him for exercising such rights. *Id.* ¶¶ 77–83. In the third cause of action, Robles alleges that all defendants discriminated and retaliated against him on the basis of his disability in violation of the New York State Human Rights Law. *See* N.Y. Exec. Law ("NYSHRL") §§ 296(1)(a), 296(7) (McKinney 2020); FAC ¶¶ 84–88. In the fourth cause of action, Robles alleges that the individual Doe and Roe defendants aided and abetted discrimination and retaliation in violation of the NYSHRL. *See* NYSHRL § 296(6); FAC ¶¶ 89–91. In the fifth cause of action, Robles alleges that all defendants discriminated and retaliated against him in violation of the New York City Administrative Code. *See* N.Y.C. Admin. Code ("NYCHRL") § 8-107(1)(a) (2020); FAC ¶¶ 92–96. In the sixth cause of action, Robles alleges that the individual Doe and Roe defendants aided and abetted discrimination and retaliation in violation of the NYCHRL. *See* NYCHRL § 8-107(6); FAC ¶¶ 97–101. In the seventh cause of action, Robles alleges that all

defendants breached their fiduciary duty to maintain the confidentiality of his medical records. FAC ¶¶ 102–05. Finally, in the eighth cause of action, Robles alleges that the Hospital is liable for negligent hiring, training, retention, and/or supervision. *See id.* ¶¶ 106–11.

The Hospital filed the instant motion to dismiss, seeking to dismiss only those claims asserted against it—and not those asserted against the Doe and Roe defendants—for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Notice of Mot., ECF No. 22; Mem. of Law in Supp. of Mot. to Dismiss 1 n.1, ECF No. 22-1 ("Def.'s Br."). Thus, the Hospital moves to dismiss the first, second, third, fifth, seventh, and eighth causes of action as asserted against it. Def.'s Br. 1 n.1.

## DISCUSSION

Under Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). In deciding a Rule 12(b)(6) motion to dismiss, the court must "accept[] all factual allegations in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). Nonetheless, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In particular, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. Further, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 476 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. To determine whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Id.* at 679. A plaintiff need not show that a defendant's liability is a "probability," but a plaintiff must raise "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Certain employment discrimination claims—once they reach the evidentiary stage of litigation—implicate the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). This framework requires that a plaintiff "carry the initial burden under the statute of establishing a prima facie case of . . . discrimination." *Id.* at 802. However, "an employment discrimination plaintiff need not *plead* a prima facie case of discrimination[.]" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) (emphasis added). In *Swierkiewicz*, the Supreme Court of the United States held that such a plaintiff need only plead "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 508 (quoting Fed. R. Civ. P. 8(a)(2)). After deciding *Swierkiewicz*, however, the Supreme Court decided *Twombly* and *Iqbal*, which clarified that, under Federal Rule of Civil Procedure 8, a complaint must allege "enough facts to state a claim to relief that is plausible on its face," so as to enable the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged[.]" *E.E.O.C. v. Port Authority of New York and New Jersey*, 768 F.3d 247, 253 (2d Cir. 2014) (first quoting *Twombly*, 550 U.S. at 570, then quoting *Iqbal*, 556 U.S. at 678). "Reconciling *Swierkiewicz*, *Twombly*, and *Iqbal*, a complaint need not establish a prima facie case of

employment discrimination to survive a motion to dismiss; however, 'the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim.'" *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010) (quoting *Fowler v. Scores Holding Co., Inc.*, 677 F. Supp. 2d 673, 679 (S.D.N.Y. 2009)); *see Bakeer v. Nippon Cargo Airlines, Co., Ltd.*, Nos. 09 CV 3374 (RRM), 09 CV 3375 (RRM), 09 CV 3377 (RRM), 09 CV 3378 (RRM), 2011 WL 3625103, at *22, *40, *42 (E.D.N.Y. July 25, 2011) (stating the same and analyzing motion to dismiss ADA and FMLA claims), *report and recommendation adopted by* 2011 WL 3625083 (E.D.N.Y. Aug. 12, 2011), *and adopted sub nom. by* 2011 WL 5402642 and 2011 WL 5429642 (E.D.N.Y. Nov. 7, 2011). Further, the elements of a prima facie case of discrimination "'provide an outline of what is necessary to render [a plaintiff's] claims for relief plausible[,]' and courts consider these elements in determining whether there is sufficient factual matter in the complaint which, if true, gives [a] [d]efendant a fair notice of [p]laintiff's claim and the grounds on which it rests." *Murphy v. Suffolk Cty. Cmty. Coll.*, No. 10–CV–0251 (LDW) (AKT), 2011 WL 5976082, at *5 (E.D.N.Y. Nov. 29, 2011) (quoting *Sommersett v. City of New York*, No. 09 Civ. 5916 (LTS) (KNF), 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011)).

## I.     The ADA discrimination and failure to accommodate claims are not dismissed, and the ADA retaliation, interference, coercion, and intimidation claims are dismissed.

### A. The plaintiff is not bound by the allegations in his original Complaint, and I will not disregard his amended allegations.

The Hospital first argues that because the First Amended Complaint contradicts certain allegations raised in the original Complaint, Robles is bound by his initial allegations, and I must disregard the amended allegations. *See* Def.'s Br. 3–5. Specifically, in his original Complaint, Robles alleged that he suffered from a "temporary incapacity due to bereavement" and that he was "temporarily disabled" or had a "temporary disability." Compl. ¶¶ 2, 39–40, 49, 62, 64, 70. In the

First Amended Complaint, Robles alleges that, while his "symptoms were severely exa[cerbated] by the . . . trauma [of his girlfriend's daughter's death and funeral], his underlying conditions were not temporary or a mere impairment." FAC ¶ 35. The Hospital argues that this revision is significant because, in its view, "temporary impairments" do not render a person disabled within the meaning of the ADA; as such, the ADA does not protect individuals with "temporary impairments." Def.'s Br. 3 (citing *Verdi v. Potter*, No. 08 Civ. 2687 (DRH) (WDW), 2010 WL 502959, at *5 (E.D.N.Y. Feb. 9, 2010)). I will address the issue of whether Robles has sufficiently alleged that he is disabled within the meaning of the ADA below in Section I.B.i. As an initial matter, Robles is not bound by his original Complaint, and I decide the instant motion based on the allegations in the First Amended Complaint.

Courts in this circuit have taken various approaches to dealing with allegations in an amended complaint that directly contradict allegations set forth in a prior version of the complaint. *See Palm Beach Strategic Income, LP v. Salzman*, No. 10–CV–261 (JS) (AKT), 2011 WL 1655575, at *5–6 (E.D.N.Y. May 2, 2011) (reviewing different approaches among district courts and concluding that, in a typical case, a court should accept a complaint's allegations as true notwithstanding prior inconsistent pleadings), *aff'd*, 457 F. App'x 40 (2d Cir. 2012) (summary order). Some courts have rejected the amended allegations and instead relied on the original pleading. *See Kasparov v. Ambit Tex., LLC*, No. 12-CV-3488 (WFK) (JO), 2016 WL 10749156, at *3 (E.D.N.Y. Mar. 10, 2016) (citing *Wallace v. N.Y.C. Dep't of Corr.*, No. 95 CV 4404, 1996 WL 586797, at *2 (E.D.N.Y. Oct. 9, 1996)) (disregarding amended complaint when plaintiff "blatantly contradict[ed] previous factual allegations"), *report and recommendation adopted by* 2016 WL 6779497 (E.D.N.Y. Nov. 16, 2016); *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (accepting as true facts set

forth in original complaint, rather than in amended complaint, when amended complaint blatantly contradicted original allegations in clear attempt to avoid dispositive defense that defendant had raised), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (summary order). Others have accepted the amended pleading despite any inconsistencies. *See Phillips v. City of Middletown*, No. 17-CV-5307 (CS), 2018 WL 4572971, at *4 (S.D.N.Y. Sept. 24, 2018) (citing cases and concluding that "because Plaintiff has filed the Amended Complaint, the Court will not import information from the original Complaint"); *In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006) (quoting *Limited, Inc. v. McCrory Corp.*, 683 F. Supp. 387, 395 n.5 (S.D.N.Y. 1988)) ("While prior inconsistent pleadings normally are admissible against a party, they ordinarily are 'controvertible, not conclusive' admissions."). As a related—but distinct—matter, a court may deny leave to amend a complaint when a plaintiff seeks to omit certain allegations or raise allegations that directly contradict those in the prior version of the complaint. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998) (upholding district court's denial of leave to file second amended complaint when plaintiff sought to omit admissions made in first amended complaint), *abrogated on other grounds by Swierkiewicz*, 534 U.S. 506; *Staten Island Chiropractic Assocs., PLLC v. Aetna, Inc.*, No. 12-cv-6239 (CBA) (VVP), 2014 U.S. Dist. LEXIS 140895, at *22–23 (E.D.N.Y. July 30, 2014) ("Because Plaintiffs' proposed amended complaint directly contradicts their earlier admission . . ., allowing leave to amend is inappropriate[.]"); *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 166–67 (2d Cir. 2003) (quoting *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985)) (upholding district court's denial of motion to reconsider, when district court had denied permission to amend complaint for third time, because allegations in second amended complaint were "judicial admission[s]" that "bound" plaintiff "throughout the course of the

10

proceeding").

Here, the First Amended Complaint does not directly contradict the original Complaint. Rather, it clarifies the initial characterization of Robles's disability as "temporary" by explaining that it was the exacerbation of the symptoms of his condition that was temporary, and not the underlying condition itself. FAC ¶ 35. Such a clarification does not amount to the sort of "blatant contradict[ion]" that might justify my disregarding the amended allegations. *Kasparov*, 2016 WL 10749156, at *3; *Colliton*, 2008 WL 4386764, at *6. And, even if the amended allegations did contradict the original Complaint, I would be under no obligation to disregard them entirely, given the diverging approaches to dealing with contradictory allegations within this circuit. Thus, Robles is not bound by the allegations in his original Complaint, and the fact that the First Amended Complaint clarifies earlier allegations is not a ground for dismissal.

### B.  The plaintiff has stated an ADA discrimination claim.

To state a plausible ADA discrimination claim,

> a plaintiff must allege that: '(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [plaintiff's] disability or perceived disability.'

*Caskey v. County of Ontario*, 560 F. App'x 57, 58 (2d Cir. 2014) (summary order) (quoting *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005)). "Claims alleging disability discrimination in violation of the ADA are subject to the [*McDonnell Douglas*] burden-shifting analysis" at the evidentiary stage of litigation. *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)). In this case, the Hospital concedes the first element of the ADA discrimination claim— that it is covered by the ADA—and it assumes for the purposes of the instant motion, but does not

concede, that Robles was qualified to perform the essential functions of his job—the third element. *See* Def.'s Br. 6, 7 n.7. Accordingly, I discuss only the second and fourth elements of the ADA discrimination claim. I will first address whether Robles has plausibly alleged that he has a "disability" within the meaning of the ADA. I will then address whether Robles has plausibly alleged that he suffered an adverse employment action because of that disability.

### i. The plaintiff has adequately alleged that he has a "disability" within the meaning of the ADA.

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual[.]" 42 U.S.C. § 12102(1)(A).[4] The Equal Employment Opportunity Commission ("EEOC") has promulgated regulations that expand upon this definition. Courts in the Second Circuit "accord 'great deference' to the EEOC's interpretation of the ADA, since it is charged with administering the statute." *Francis v. City of Meriden*, 129 F.3d 281, 283 n.1 (2d Cir. 1997) (quoting *Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 309 (2d Cir. 1996)). The EEOC regulations define "major life activities" as including, but not limited to

> [c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and
>
> [t]he operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.

29 C.F.R. § 1630.2(i)(1)(i)–(ii).

---

[4] In addition, "a record of such an impairment" and "being regarded as having such an impairment" constitute disabilities. § 12102(1)(B)–(C). Because the parties do not discuss these aspects of the definition of "disability" in their briefs, I do not analyze them here.

The regulations also set forth an extensive explanation of what it means for an impairment to "substantially limit[]" a major life activity. 42 U.S.C. § 12102(1)(A); *see* 29 C.F.R. § 1630.2(j). Notably, the ADA Amendments Act of 2008 (the "ADAAA") had the "primary purpose" of making "it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). Accordingly, "the definition of 'disability' . . . shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA." *Id.* Therefore, the EEOC regulations instruct that "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." *Id.* § 1630.2(j)(1)(iv). In accordance with the ADAAA's purpose of expanding ADA coverage, the regulations specify that "'[s]ubstantially limits' is not meant to be a demanding standard[,]" and "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." *Id.* § 1630.2(j)(1)(i), (iii). Still, "not every impairment will constitute a disability[.]" *Id.* § 1630.2(j)(1)(ii). "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* Further, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id.* § 1630.2(j)(1)(vii).

A medical diagnosis, without more, "establish[es] only that [a] plaintiff suffered an impairment," and "not that his ability . . . was substantially limited by that impairment." *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 136 n.10 (E.D.N.Y. 2015); *see Hedges v. Town of Madison*, 456 F. App'x 22, 24 (2d Cir. 2012) (summary order) (rejecting argument that district court should have inferred that plaintiff was disabled because he alleged merely that he suffered from various medical conditions). However, the EEOC does accord some weight to certain medical diagnoses.

13

The regulations explain that "the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage[.]" 29 C.F.R. § 1630.2(j)(3)(ii). "For example, . . . it should be easily concluded that . . . major depressive disorder [and] bipolar disorder . . . substantially limit brain function." *Id.* § 1630.2(j)(3)(iii).

In addition, the Second Circuit has explicitly left open the question of "whether temporary injuries are *per se* unprotected under the ADA." *Adams v. Citizens Advice Bureau*, 187 F.3d 315, 317 (2d Cir. 1999) (per curiam). Nonetheless, in that same case, the Second Circuit concluded that a plaintiff who suffered injuries to his neck, back, and knee in a car accident and, consequently, became unable to work for three and a half months "failed to make out a claim that he was disabled within the meaning of the ADA." *Id.* at 316–17. District courts in this circuit, too, have concluded that certain temporary impairments did not constitute disabilities within the meaning of the ADA. *See Jackson v. Nor Loch Manor HCF*, 134 F. App'x 477, 478 (2d Cir. 2005) (summary order) (upholding district court's conclusion that plaintiff failed to establish prima facie case of ADA discrimination when record showed merely that plaintiff had surgery for an abscess that required temporary absence from work); *Soto v. Marist Coll.*, No. 17-CV-7976 (KMK), 2019 WL 2371713, at *2, *13–14 (S.D.N.Y. June 5, 2019) (dismissing ADA discrimination claim when plaintiff suffered bladder illness that required emergency surgery and caused plaintiff to miss several weeks of work, reasoning that temporary medical conditions do not constitute disabilities because they are not substantially limiting); *Dohrmann-Gallik v. Lakeland Cent. Sch. Dist.*, No. 14–cv–4397 (NSR), 2015 WL 4557373, at *7 (S.D.N.Y. July 27, 2015) ("[A]n absence from work due to a temporary condition—even if lengthy—is not, on its own, a substantial limitation of a major life activity."); *Verdi*, 2010 WL 502959, at *1 n.2, *5–6 (concluding that plaintiff did not adequately allege disability when he alleged that he suffered physical injury that rendered him unable to work

14

for approximately two months); *Pierre v. N.Y. State Dep't of Corr. Servs.*, No. 05 Civ. 0275(RJS), 2009 WL 1583475, at *17 (S.D.N.Y. June 1, 2009) (concluding that plaintiff failed to establish prima facie case of ADA discrimination when she suffered injuries to leg, hip, neck, and shoulder because she put forth no evidence that those injuries were permanent or long-term or that they substantially limited a major life activity); *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 312 (S.D.N.Y. 2003) ("[W]here an individual finds it difficult to concentrate only on occasion, his ability to concentrate is not substantially limited."); *Williams v. Salvation Army*, 108 F. Supp. 2d 303, 312–13 (S.D.N.Y. 2000) (concluding that plaintiff who suffered head injury did not have a disability when evidence showed that injury was "temporary and *de minimis*"). However, many of these cases—which the Hospital cites in its briefs—were decided before the ADAAA went into effect or relied on pre-ADAAA case law or regulations. *See Adams*, 187 F.3d at 317 (decided pre-ADAAA in 1999); *Jackson*, 134 F. App'x at 478 (citing *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002), which itself was overturned by ADAAA and relied on since-superseded, pre-ADAAA version of EEOC regulation that required impairment to have "permanent or long term" impact); *Verdi*, 2010 WL 502959, at *5 (citing same pre-ADAAA EEOC regulation); *Pierre*, 2009 WL 1583475, at *17 (citing *Toyota Motor Mfg., Ky., Inc.*, 534 U.S. at 198); *Sussle*, 269 F. Supp. 2d at 311 (citing same pre-ADAAA EEOC regulation); *Williams v. Salvation Army*, 108 F. Supp. 2d at 312 n.12 (same). Thus, they were decided under a stricter ADA regime, before the ADAAA expanded "the definition of 'disability' . . . [to] be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.1(c)(4).

In this case, Robles has alleged sufficient facts to make it plausible that he has a disability within the meaning of the ADA—that is, that he has a mental impairment that substantially limits

one or more of his major life activities. 42 U.S.C. § 12102(1)(A). Robles alleges that he was diagnosed with bipolar disorder in May 2018. FAC ¶ 23. At that time, his symptoms were serious enough to require a week-long hospitalization. *See id.* Robles further alleges that, on November 3, 2018, he had "a mental breakdown and was found lying in the street." *Id.* ¶ 36. After an ambulance brought him to the Hospital, he received treatment for intoxication, depression, and bipolar disorder. *See id.* In addition, he alleges that the symptoms that he experienced in early November 2018 resulted in his being "unable to concentrate" and having "extreme difficulties breathing[.]" *Id.* ¶ 34. Robles alleges a subsequent, additional hospitalization on an undisclosed date, which I can infer occurred because of his bipolar disorder. *See id.* ¶ 56. It is plausible that the symptoms of Robles's bipolar disorder limited several of his major life activities, including concentrating and breathing—as he explicitly alleges—as well as brain function, the impact upon which I can infer from the fact of his "mental breakdown." 29 C.F.R. § 1630.2(i)(1)(i)–(ii) (listing major life activities); FAC ¶¶ 34, 36. It is also plausible that the limitations on these major life activities were substantial, as Robles describes his difficulty breathing as "extreme," underwent three hospitalizations, and, at one point, "was found lying in the street." FAC ¶¶ 23, 34, 36, 56.

Moreover, the EEOC regulations instruct that I should "easily" conclude that bipolar disorder substantially limits brain function. 29 C.F.R. § 1630.2(j)(3)(iii). Especially considering that this case is at the pleading stage—where the face of the First Amended Complaint need only permit me to draw the reasonable inference that Robles was disabled—and considering the regulations' direction, I conclude that the First Amended Complaint plausibly alleges that Robles has an ADA-covered disability. *Compare Mazzocchi v. Windsor Owners Corp.*, No. 11 Civ. 7913 (AT), 2013 WL 5295089, at *7–8 (S.D.N.Y. Sept. 17, 2013) (finding it plausible, at pleading stage, that plaintiff had ADA-covered disability when she alleged that she had bipolar disorder and that

16

it impaired her abilities "to sleep, concentrate, learn, work, and interact with others" and citing post-ADAAA regulations calling for expansive ADA coverage), *with Bonilla v. BOCES*, No. 06–CV–6542, 2010 WL 3488712, at *5–6 (W.D.N.Y. Sept. 2, 2010) (concluding, on summary judgment, that plaintiff could not establish prima facie case that she was disabled because her depression and bipolar disorder were not disabilities when plaintiff presented only "limited evidence" that they substantially limited major life activities), *and Horwitz v. L & L.G. Stickley, Inc.*, 122 F. Supp. 2d 350, 354–56 (N.D.N.Y. 2000) (applying pre-ADAAA EEOC regulations and concluding, on summary judgment, that plaintiff presented insufficient evidence to enable a jury to conclude that her bipolar disorder substantially limited any major life activities).[5]

I disagree with the Hospital's assertion that Robles could not have had an ADA-protected disability because his impairment was "temporary." Def.'s Br. 3, 8. Robles alleges that he has been hospitalized three times: once in May 2018, once in November 2018, and once at an undisclosed

---

[5] In a footnote, the Hospital asserts that "employees who are current substance abusers . . . are not disabled within the meaning of federal law." Def.'s Br. 3 n.5; *see* FAC ¶ 36 (alleging that Robles was treated for intoxication, in addition to depression and bipolar disorder, during his November 2018 hospitalization); Compl. ¶ 35 (referencing Robles's treatment for "alcoholism" during his November hospitalization). This assertion is inaccurate and does not impact my analysis. In *Brennan v. N.Y.C. Police Dep't*, which the Hospital cites, the Second Circuit observed that "[t]he parties do not dispute that . . . a recovering alcoholic[] qualifies as a disabled individual under the ADA" and proceeded to analyze whether the plaintiff was "otherwise qualified" for his job—a question not at issue here. No. 97-7779, 1998 WL 51284, at *3 (2d Cir. 1998) (summary order); Def.'s Br. 7 n.7; *see also D'Amico v. City of New York*, 132 F.3d 145, 150–51 (2d Cir. 1998) (concluding that employee with cocaine addiction who had made prima facie case that he had disability under Rehabilitation Act nonetheless failed to establish that he could perform essential functions of his job). Although a court in this district has recognized that "[t]he ADA does not require that employers tolerate misconduct traceable to an employee's alcoholism, nor does it protect alcoholics from the consequences of their own behavior," *Klaper v. Cypress Hills Cemetery*, No. 10-CV-1811 NGG LB, 2014 WL 1343449, at *10 (E.D.N.Y. Mar. 31, 2014), *aff'd*, 593 F. App'x 89 (2d Cir. 2015) (summary order), that case does not stand for the proposition that a plaintiff who is an alcoholic cannot also be disabled. In addition, discovery is necessary to determine whether Robles was, in fact, an alcoholic, and whether he engaged in "misconduct traceable to . . . alcoholism." *Id.* at *10.

later time. *See* FAC ¶¶ 23, 36–37, 56. Accordingly, it is plausible that Robles's impairment is at

least "episodic," in which case it "is a disability if it would substantially limit a major life activity

when active." 29 C.F.R. § 1630.2(j)(1)(vii). As discussed, Robles has plausibly alleged that the

symptoms of his bipolar disorder, when active, substantially limit multiple major life activities.

Moreover, even if Robles's impairment were merely temporary, it would not be "*per se*

unprotected under the ADA[,]" *Adams*, 187 F.3d at 317, and, as discussed, many of the Hospital's

cited cases denying ADA protection to plaintiffs with temporary impairments were decided before

the ADAAA expanded the ADA's coverage. Discovery will reveal the full extent of Robles's

impairment and whether it does, in fact, substantially limit any of his major life activities. At the

pleading stage, Robles has plausibly alleged that it does.[6]

> ### ii. The plaintiff has adequately alleged that he suffered an adverse employment action because of his disability.

In order to state a claim for ADA discrimination, a plaintiff must plausibly allege that he

"suffered an adverse employment action because of [his] disability[.]" *Caskey*, 560 F. App'x at 58

(quoting *Capobianco*, 422 F.3d at 56). Here, Robles alleges that, during his November 2018 stay

in the emergency room, a nurse "refused to allow [him] to see his girlfriend[,] who was also being

treated in Jamaica Hospital." FAC ¶ 39. Robles "got into a verbal altercation with" this nurse. *Id.*

¶ 40. Only "other care providers at the hospital" could have witnessed this altercation. *Id.* ¶ 41.

---

[6] It is not clear how, if at all, the fact that the November exacerbation of Robles's symptoms occurred when he was already on leave is relevant here. *See* Def.'s Br. 5, 8 n.9. In particular, the Hospital argues that Robles's allegations "merely demonstrate that *while he was already on leave*, Plaintiff was unable to perform the essential functions of his job." *Id.* at 5. The ADA discrimination standard requires that Robles allege that he was "*qualified* to perform the essential functions of the job, with or without reasonable accommodation[.]" *Caskey*, 560 F. App'x at 58 (emphasis added) (quoting *Capobianco*, 422 F.3d at 56). But the Hospital wrote that it assumes that this element is satisfied for the purposes of the instant motion. Def.'s Br. 7 n.7. In any case, it is not clear how the Hospital's argument—that Robles was unable to perform the essential functions of his job only during a very limited time while he was not working anyway—would help its case.

The Hospital then fired Robles, with a human resources representative informing him that his firing was "due to events over the weekend." *Id.* ¶ 45.

Although it is plausible that the "event[]" to which the representative referred was the verbal altercation with the nurse, it is also plausible that the term "events" referred to Robles's hospitalization and treatment for bipolar disorder. "[D]rawing all reasonable inferences in the plaintiff's favor"—as I must do on a motion to dismiss—it is plausible that the care providers who witnessed the altercation informed Robles's supervisor that Robles underwent treatment for bipolar disorder, which led to his termination. *Lundy*, 711 F.3d at 113 (quoting *Holmes*, 568 F.3d at 335).

Robles also alleges that his supervisors and co-workers knew that he had requested leave on October 27, 2018 "because of the exa[cerbation] of his mental health symptoms due to the death of his partner's daughter." FAC ¶ 48. This allegation also allows me to infer that the Hospital fired Robles because of his disability, as it shows that Robles's supervisors knew that he suffered from mental health symptoms on October 27, 2018, and fired him only shortly thereafter, on November 5, 2018. *Id.* ¶ 45. Therefore, Robles has adequately alleged that he suffered an adverse employment action—his firing—because of his disability. Accordingly, Robles has stated an ADA discrimination claim.

### C. The plaintiff has stated a claim for failure to accommodate in violation of the ADA.

The ADA's prohibition on discrimination against an employee based on disability includes a prohibition on denying "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business[.]" 42 U.S.C. § 12112(b)(5)(A); *see McMillan*, 711 F.3d at 125–26. To state a claim for

failure to accommodate, "a plaintiff must allege that: (1) []he was an individual with a disability within the meaning of the ADA; (2) defendant had notice of [his] disability; (3) []he could perform the essential functions of [his] position with a reasonable accommodation; and (4) defendant refused to make such an accommodation." *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 608 (E.D.N.Y. 2013) (citing *Conley v. United Parcel Serv.*, 88 F. Supp. 2d 16, 18 (E.D.N.Y. 2000)); *see McMillan*, 711 F.3d at 125–26 (quoting *McBride*, 583 F.3d at 97) (listing same elements as comprising prima facie case for failure to accommodate).

I have already concluded that Robles has adequately alleged the first element—that he has a disability within the meaning of the ADA. I will now address the third element: whether Robles adequately alleged that, with a reasonable accommodation, he could have performed the essential functions of his job. I will then address the second and fourth elements—whether the Hospital had notice of Robles's disability and whether the Hospital refused to make an accommodation— together. *See Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 81–82 (2d Cir. 2020) (analyzing second and fourth elements together).

### i. The plaintiff has plausibly alleged that, with the reasonable accommodation of a finite period of additional leave, he could have performed the essential functions of his job.

Robles alleges that, instead of firing him on November 5, 2018, the Hospital should have granted him the "reasonable accommodation of additional leave," which would have allowed him to "treat the symptoms of his mental health conditions in a manner that would have enabled him to return to work and perform the essential functions of his job." FAC ¶ 54. He further alleges that "[t]he period of leave required for [him] to obtain the necessary treatment for stabilizing his condition would have been a definite period of time." *Id.* ¶ 55.

The Second Circuit has never resolved "whether paid or unpaid leave can constitute a

reasonable accommodation under the ADA[.]" *Petrone v. Hampton Bays Union Free Sch. Dist.*, 568 F. App'x 5, 7 n.2 (2d Cir. 2014) (summary order) (citing *Graves v. Finch Pruyn & Co., Inc.*, 353 F. App'x 558, 560 (2d Cir. 2009) (summary order) ("*Graves II*") and *Graves v. Finch Pruyn & Co. Inc.*, 457 F.3d 181, 186 n.6 (2d Cir. 2006) ("*Graves I*")). However, assuming that leave could constitute a reasonable accommodation, the Second Circuit has reasoned that such leave would have to "enable the employee to perform the essential functions of his job." *Id.*; *see Goodwin v. MTA Bus Co.*, No. 14-CV-4775 (RRM) (JO), 2017 WL 1251091, at *5 (E.D.N.Y. Mar. 27, 2017); *see also Stevens v. Rite Aid Corp.*, 851 F.3d 224, 230 (2d Cir. 2017) (quoting *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003)) ("A reasonable accommodation can never involve the elimination of an essential function of a job."). The Second Circuit has also indicated that a *finite* leave of absence—in one case, lasting two weeks—could amount to a reasonable accommodation. *See Graves I*, 457 F.3d at 185–86, 186 n.6 (reversing grant of summary judgment to employer when district court incorrectly found that plaintiff had requested an indefinite amount of time off). In doing so, the Second Circuit explicitly declined to "reach the question of how assured the employer must be of an employee's successful return following a proposed finite leave of absence in order for the finite leave to be a reasonable accommodation." *Id.* at 186 n.6. Still, it observed that "courts considering this question have concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work." *Id.* (citing cases). Thus, when a plaintiff made no showing that, at the time of his request for two weeks of leave, his employer had any assurance that such leave "would allow him to perform the essential functions of his job[,]" he failed to make a prima facie case that his requested accommodation was reasonable. *See Graves II*, 353 F. App'x at 560–61; *see also Jarrell v. Hosp. for Special Care*, 626 F. App'x 308, 312 (2d Cir. 2015) (summary order) ("[T]he

21

accommodation [plaintiff] sought was in essence an indeterminate period of leave and . . . such accommodation would be unreasonable."); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely . . . however, an employee who proposes an accommodation while still on short-term leave . . . triggers a responsibility on the employer's part to investigate that request and determine its feasibility."); *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 9 (2d Cir. 1999) (concluding that employer had no obligation to grant employee indefinite leave of absence). Notably, when the Second Circuit has addressed this issue, it has done so on summary judgment. *See Jarrell*, 626 F. App'x at 309; *Petrone*, 568 F. App'x at 6; *Graves II*, 353 F. App'x at 559; *Graves I*, 457 F.3d at 183; *Parker*, 204 F.3d at 330; *Mitchell*, 190 F.3d at 2. These cases do not set forth a pleading requirement for a plaintiff who claims failure to accommodate based on an employer's denial of a leave of absence.

In this case, Robles has sufficiently alleged that an additional leave of absence would have been a reasonable accommodation that would have enabled him to perform the essential functions of his job.[7] Robles alleges that an additional period of leave—which would have lasted for "a definite period of time"—would have allowed him to treat his symptoms, which, in turn, "would have enabled him to return to work and perform the essential functions of his job." FAC ¶¶ 54–55. The Second Circuit has observed that precisely this set of facts may demonstrate that a leave of absence is a reasonable accommodation. *See Graves I*, 457 F.3d at 186 n.6 (citing cases) ("We note that courts considering this question have concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work."). In addition, Robles alleges that he took one week of leave in May 2018 to

---

[7] The Hospital does not challenge what, precisely, those essential functions were.

treat his bipolar disorder. *See* FAC ¶¶ 23–24. Subsequently, he "was able to perform the essential functions of his job" until the October 27, 2018 exacerbation of his symptoms. *Id.* ¶ 21. These allegations allow me to infer both that an additional period of leave would have again enabled Robles to treat his symptoms and return to work and that such a period of leave could plausibly have been relatively brief—one week, or approximately two weeks when combined with the leave that he had already taken from October 27 until November 5, 2018. *See Graves I*, 457 F.3d at 185–86, 186 n.6 (indicating, without holding, that finite period of leave lasting two weeks could constitute reasonable accommodation). Therefore, Robles has sufficiently alleged that, with a reasonable accommodation, he could have performed the essential functions of his job.

> **ii. Because he alleged that the Hospital knew or should have known that he had a disability, and that it declined to engage in the interactive process with him, the plaintiff has plausibly alleged that the Hospital refused to make a reasonable accommodation.**

The remaining elements of the failure to accommodate claim are that the employer must have had notice of the employee's disability, and the employer must have refused to make a reasonable accommodation. *See Jordan*, 928 F. Supp. 2d at 608 (citing *Conley*, 88 F. Supp. 2d at 18). "[G]*enerally*, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (alteration in original) (quoting *Graves I*, 457 F.3d at 184). However, "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Id.*; *see Hensel v. City of Utica*, 6:15-CV-0374 (LEK/TWD), 2020 WL 1451579, at *10 n.13 (N.D.N.Y. Mar. 25, 2020) (quoting *Kho v. N.Y. and Presbyterian Hosp.*, 344 F. Supp. 3d 705, 721 (S.D.N.Y. 2018)) ("Although some courts have stated categorically that 'an employer cannot be liable for failing to provide an accommodation that was never requested,' . . . under *Brady*, this

does not appear to be correct[.]"). When an employer knew or reasonably should have known that an employee was disabled, its obligation was to "engage in the . . . interactive process"—that is, to work with the employee "to assess whether [the] employee's disability can be reasonably accommodated." *Brady*, 531 F.3d at 135–36 (quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)).[8] "To trigger the duty to engage in the interactive accommodations process, the employer must have known, or have had sufficient notice such that the employer reasonably should have known, that the employee has a disability within the meaning of the [statute], as opposed to a mere impairment." *Costabile*, 951 F.3d at 81 (citing *Brady*, 531 F.3d at 134 in case arising under Rehabilitation Act, which implicates same failure to accommodate standard as does the ADA).

In this case, Robles adequately alleges that the Hospital knew, or reasonably should have known, that he had a disability within the meaning of the ADA. Robles alleges that the Hospital knew about his bipolar disorder as early as May 2018, when it granted him time off for treatment. *See* FAC ¶¶ 23–24. On October 27, 2018, Robles requested leave again, and the Hospital granted him leave until November 5, 2018. *See id.* ¶¶ 30–31. During that leave, Robles experienced severe symptoms of his bipolar disorder that, as discussed above, plausibly would have substantially limited his major life activities of concentrating, breathing, and brain function. *See id.* ¶¶ 34–36.

---

[8] It is true that, as the Hospital argues, an employer's failure to engage in this interactive process, without more, is not an independent cause of action under the ADA. *See McBride*, 583 F.3d at 99–101; Def.'s Br. 11 n.13. However, the Second Circuit has held that "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA . . . unless [a plaintiff] also establishes that, at least with the aid of some identified accommodation, [the plaintiff] was qualified for the position at issue." *Id.* at 101. Therefore, the failure of an employer—who knew or reasonably should have known about an employee's disability—to engage in the interactive process is a proper basis for an ADA failure to accommodate claim when, as alleged here, there was a reasonable accommodation that would have enabled the employee to perform the essential functions of his job. *See id.* at 100.

After Robles "suffered a mental breakdown and was found lying in the street[,]" he received treatment for his bipolar disorder and other conditions at the Hospital. *Id.* ¶¶ 36–37. Medical staff members who treated Robles either shared his records with Robles's supervisors or informed his supervisors that Robles was hospitalized. *See id.* ¶ 44. The Hospital then fired Robles. *See id.* ¶ 45. These allegations enable me to draw the reasonable inference that the Hospital, in its capacity as Robles's employer, knew that he was receiving treatment for his bipolar disorder at the time of his termination. It is also plausible that the Hospital knew that the symptoms of Robles's bipolar disorder substantially limited several of his major life activities, as presumably Robles's medical records would have contained details about the circumstances surrounding his mental breakdown and his difficulties breathing and concentrating. *Cf. Costabile*, 951 F.3d at 82 (concluding that allegation that defendants knew that plaintiff was on disability leave for injuries, without more, was not plausible allegation that defendants had notice that those injuries constituted a disability as statutorily defined).

Accordingly, the Hospital had an obligation to engage in the interactive process with Robles, and Robles has plausibly alleged that it did not engage in such a process. Robles alleges that on the day that the Hospital had scheduled him to return to work, it fired him. *See* FAC ¶¶ 31, 45. Robles asked to speak to his supervisors "to explain his condition and the events that occurred[,]" but the human resources representative "refused to give [him] permission to speak to anyone else regarding his termination, his condition, or events associated with his hospitalization." *Id.* ¶¶ 50–51. The Hospital did not "attempt[] to engage with [Robles] to determine if he could be accommodated[.]" *Id.* ¶ 53. The Hospital went so far as to send Robles a letter "stating that he would be arrested if he was found on the premises of Jamaica Hospital." *Id.* ¶ 52. These facts provide a plausible basis on which I can conclude that the Hospital failed to engage in the

interactive process with Robles—as it was obligated to do once it knew, or reasonably should have

known, that Robles had a disability—in order to determine whether it could provide him with a

reasonable accommodation. Therefore, Robles has stated a claim for failure to accommodate in

violation of the ADA.

### D. The ADA retaliation, interference, coercion, and intimidation claims are dismissed.

Under the ADA, "[n]o person shall discriminate against any individual because such

individual has opposed any act or practice made unlawful by this chapter or because such

individual made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a) (proscribing retaliation). In

addition, the ADA makes it "unlawful to coerce, intimidate, threaten, or interfere with any

individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed,

. . . any right granted or protected by this chapter." *Id.* § 12203(b). I will first address why Robles

has failed to state a claim for ADA retaliation. I will then address why Robles has failed to state a

claim for ADA interference, coercion, or intimidation.

### i. The plaintiff has failed to state a claim for ADA retaliation because he has not plausibly alleged that he engaged in an ADA-protected activity with any causal connection to an adverse employment action.

To state a claim for ADA retaliation, "a plaintiff must allege that: '(1)[  ]he engaged in an

activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took

an adverse employment action against [him]; and (4) a causal connection exists between the

alleged adverse action and the protected activity.'" *Caskey*, 560 F. App'x at 58 (quoting *Treglia v.

Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)); *Schiavone v. N.Y. State Office of Rent Admin.*,

No. 18-cv-130 (NSR), 2018 WL 5777029, at *5 (S.D.N.Y. Nov. 2, 2018) (quoting *Sarno v.

Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)). At the evidentiary

stage, courts analyze ADA retaliation claims "under the same burden-shifting framework established for Title VII cases." *Treglia*, 313 F.3d at 719. Regarding the first element of the retaliation claim, "[a] plaintiff engages in a 'protected activity' under the ADA if []he 'has opposed any act or practice made unlawful *by this chapter*' or has 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding , or hearing *under this chapter*.'" *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 261 (S.D.N.Y. 2015) (quoting 42 U.S.C. § 12203(a)). "[R]equesting a reasonable accommodation of a disability is an ADA protected activity." *Id.* at 262 (quoting *Rodriguez v. Atria Senior Living Grp., Inc.*, 887 F. Supp. 2d 503, 512 (S.D.N.Y. 2012)). Thus, in some cases, an employer's termination in response to an employee's request for a reasonable accommodation may constitute retaliation. *See id.* However, an employer's mere failure to make an accommodation subsequent to an employee's request simply gives rise to a failure to accommodate claim and "cannot be bootstrapped into a viable disability retaliation claim." *Missick v. City of New York*, 707 F. Supp. 2d 336, 356 (E.D.N.Y. 2010).

In this case, Robles's alleged request for leave is not a plausible ADA-protected activity. Robles alleges that he requested leave on October 27, 2018. FAC ¶ 30. However, the First Amended Complaint describes this leave as "FMLA leave" and not as an accommodation under the ADA. *Id.* Nor does Robles allege sufficient facts to allow me to conclude that this leave could have constituted an accommodation of a disability under the ADA, as many of the facts that enabled me to infer that he has a disability—namely, his inability to concentrate, difficulty breathing, and mental breakdown—did not arise until after October 27. *See id.* at ¶¶ 34, 36. Therefore, Robles does not allege that his request for leave on October 27 was a request for a reasonable accommodation of a disability or any other ADA-protected activity.

Robles does allege that, after the Hospital's human resources representative fired him on

27

November 5, he asked for more information and to speak to his supervisors. *See* FAC ¶¶ 45–46,

50. At most, Robles thereby alleges that he pressed the Hospital to engage in the interactive process

with him. However, even assuming that having one's employer agree to engage in the interactive

process is an ADA-protected activity, there is no plausible causal connection between any adverse

employment action and that activity, as the Hospital had already terminated Robles when he

attempted to engage in the interactive process. *See Caskey*, 560 F. App'x at 58 (quoting *Treglia*,

313 F.3d at 719); FAC ¶¶ 45–46, 50–51. Further, although Robles does allege that he received a

letter from the Hospital "stating that he would be arrested if he was found on the premises of

Jamaica Hospital[,]" he does not allege how, if at all, this letter constituted an adverse employment

action, as the Hospital no longer employed him at that point. FAC ¶¶ 45, 52; *see Caskey*, 560 F.

App'x at 58 (quoting *Treglia*, 313 F.3d at 719). Robles's allegations related to the Hospital's

failure to engage in the interactive process simply amount to a claim for failure to accommodate

and not for retaliation.

Thus, Robles has failed to state a claim for ADA retaliation. Accordingly, I dismiss this

claim without prejudice. I will further discuss the possibility of Robles's amending this claim,

along with the others that I dismiss, at the conclusion of this opinion.

> **ii. Because the plaintiff has not plausibly alleged that the Hospital interfered with, coerced, intimidated, or threatened him in connection with his exercise of any ADA-protected right, he has failed to state a claim for ADA interference, coercion, or intimidation.**

Under the ADA, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any

individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed,

. . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). "Neither the Supreme

Court nor the Second Circuit has yet outlined a legal test for an interference claim under the ADA."

*E.E.O.C. v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 204 (D. Conn. 2017). The plain

terms of § 12203(b) "preclude a party from intimidating or coercing another party not to exercise his rights under the ADA, as well as barring interference against a person who has exercised his rights under the ADA." *Id.* (quoting *Breimhorst v. Educ. Testing Serv.*, No. C–99–CV–3387, 2000 WL 34510621, at *7 (N.D. Cal. Mar. 27, 2000)). Further, some "courts have noted that the ADA's anti-interference provision is similar to a provision in the National Labor Relations Act, 29 U.S.C. § 158 (the 'NLRA')" and have looked to interpretations of the NLRA as "useful guide[s] to interpreting similar language in the ADA, as both [statutes] are part of a wider statutory scheme to protect employees in the workplace nationwide." *Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d at 204–05 (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 570 (3d Cir. 2002)). "The Second Circuit has found that an employer's conduct violates the NLRA's prohibition on interference 'if, under all the existing circumstances, the conduct has a reasonable tendency to coerce or intimidate employees, regardless of whether they are actually coerced.'" *Id.* at 205 (quoting *N.Y. Univ. Med. Ctr. v. N.L.R.B.*, 156 F.3d 405, 410 (2d Cir. 1998)). This test is objective; still, the "subjective impact" of the employer's action on the employee is relevant, just not dispositive. *Id.* (citing *Jantz v. Emblem Health*, No. 10 Civ. 6076 (PKC), 2012 WL 370297, at *15 (S.D.N.Y. Feb. 6, 2012)).

Here, Robles has alleged no plausible basis for an interference, coercion, or intimidation claim. The ADA forbids interference, coercion, or intimidation based on an individual's exercise of his rights "protected by this chapter." 42 U.S.C. § 12203(b). As discussed, Robles has not alleged that the leave that he requested on October 27, 2018 was an ADA-protected right. *See* FAC ¶ 30. Even if this requested leave were an ADA-protected right, the Hospital granted Robles's request, and therefore did not "coerce, intimidate, [or] threaten" him on account of his having exercised that right, nor did it "interfere with" his exercise of that right. § 12203(b). In addition,

Robles's termination on November 5 could not have plausibly constituted interference, coercion, or intimidation. *See* FAC ¶ 45. As discussed, even assuming that Robles did exercise some ADA-protected right by attempting to engage in the interactive process, the Hospital fired him before he tried to initiate that process. *See id.* ¶¶ 45–46, 50–51. The Hospital's failure to engage in the interactive process simply constitutes the basis for a failure to accommodate claim, and not for an interference, coercion, or intimidation claim. Finally, the letter that Robles received stating that the Hospital would have him arrested if he returned to the Hospital's premises is also not a plausible basis for an interference, coercion, or intimidation claim. *See id.* ¶ 52. Robles has not alleged any facts to support the conclusion that the Hospital sent this letter "on account of" his having attempted to engage in the interactive process. § 12203(b). Rather, the facts alleged support the plausible conclusion that the Hospital sought to ban him from its property because of the "verbal altercation" in which he engaged with the nurse. FAC ¶ 43. Nor is it clear how, if at all, this alleged letter would have the "reasonable tendency to coerce or intimidate" someone with respect to the exercise of an ADA-protected right in the future—say, filing a complaint with the EEOC or in a civil lawsuit—as Robles has not alleged why he would need to return to the premises of Jamaica Hospital in order to exercise such a right. *Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d at 205 (quoting *N.Y. Univ. Med. Ctr.*, 156 F.3d at 410).

Therefore, Robles has failed to state a claim for ADA interference, coercion, or intimidation, and this claim is dismissed without prejudice. To summarize thus far, the ADA discrimination and failure to accommodate claims are not dismissed. The ADA retaliation, interference, coercion, and intimidation claims are dismissed without prejudice.

## II.     The FMLA claims are dismissed.

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of

leave during any 12-month period for" any of several qualifying reasons, including "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition" and "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(C)– (D). "There are four principal facets to the scope of the Act: (1) the employers to which it applies, (2) the employees who are eligible for FMLA leave, (3) the personal or family relationship in question, and (4) the qualifying reasons for the requested leave." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). The FMLA also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." § 2615(a)(2). "In the Second Circuit, these prohibitions give rise to two distinct types of FMLA claims: interference claims and retaliation claims." *Seitz v. New York*, No. 2:18-CV-4149 (PKC) (LB), 2019 WL 4805257, at *9 (E.D.N.Y. Sept. 30, 2019) (citing *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam)); *see Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 167 (2d Cir. 2017). I will first address why Robles has failed to state a claim for FMLA interference. I will then address why he has failed to state a claim for FMLA retaliation.

### A. The plaintiff has failed to state a claim for FMLA interference.

To show FMLA interference, a plaintiff must show: "1) that [plaintiff] is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that [plaintiff] was entitled to take leave under the FMLA; 4) that [plaintiff] gave notice to the

defendant of [plaintiff's] intention to take leave; and 5) that [plaintiff] was denied benefits to which [plaintiff] was entitled under the FMLA." *Coutard*, 848 F.3d at 108–09 (quoting *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016)); *see Seitz*, 2019 WL 4805257, at *10 (quoting *Graziadio*, 817 F.3d at 424 and listing same elements on a motion to dismiss); *De Figueroa v. New York*, 403 F. Supp. 3d 133, 155 (E.D.N.Y. 2019) (same).

### i. The plaintiff has not adequately alleged that he was an eligible employee, or that the Hospital is an employer, as defined by the FMLA.

The FMLA defines an "eligible employee" as "an employee who has been employed" both "for at least 12 months by the employer" and "for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110(a); *Coutard*, 848 F.3d at 108 (citing the same). "The determination of whether an employee meets the hours of service requirement and has been employed by the employer for a total of at least 12 months must be made as of the date the FMLA leave is to start." 29 C.F.R. § 825.110(d). The FMLA defines an "employer" as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year[.]" 29 U.S.C. § 2611(4)(A)(i); 29 C.F.R. § 825.104(a).

Robles has not adequately alleged that he was an eligible employee under the FMLA. Robles alleges that he was employed on a full-time, permanent basis from April 2017 until November 5, 2018. *See* FAC ¶¶ 8–9, 16, 22. He also makes the conclusory assertion that he was an "eligible employee" under the FMLA. *Id.* ¶ 80. Robles does not make any specific allegations regarding his hours, other than to assert that he worked "full-time[.]" *Id.* ¶ 8. While Robles's factual allegations allow me to conclude that he was employed for at least twelve months, they do not allow me to conclude that he was employed for at least 1,250 hours of service during the twelve

months prior to when any particular period of FMLA leave were to start. *See* 29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110(a); *Brown v. Omega Moulding Co. Ltd.*, No. 13–CV–5397 (SJF) (ARL), 2014 WL 4439530, at *4 (E.D.N.Y. Sept. 9, 2014) (dismissing FMLA claim for failure to state a claim when plaintiff made no factual allegations that enabled court to reasonably infer that plaintiff worked for more than 1,250 hours in the twelve months prior to date on which plaintiff first sought FMLA leave).

Robles also does not adequately allege that the Hospital was an FMLA-covered employer. Robles alleges that the Hospital "employs over 50 individuals on a full-time or full-time equivalent basis and thus is subject to all statutes upon which Plaintiff is proceeding herein." FAC ¶ 10. He also makes the conclusory allegations that the Hospital is an "employer" within the meaning of the FMLA. *Id.* ¶¶ 12, 80. He does not allege that the Hospital employs its more than fifty employees "for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year[.]" 29 U.S.C. § 2611(4)(A)(i); 29 C.F.R. § 825.104(a).

Thus, Robles has failed to adequately allege that he is an eligible employee, or that the Hospital is an employer, within the meaning of the FMLA. I anticipate that Robles can easily address these shortcomings in a second amendment to the complaint. However, it would be fruitless for him to make such amendments only for his claim to fail at another element. Therefore, rather than ending my analysis here, I will proceed to discuss the additional reasons why, as alleged, Robles's FMLA interference claim is inadequate.

### ii. Because the plaintiff has not pled sufficient facts to support the inference that he had a serious health condition that made him unable to perform the functions of his position, he has not plausibly alleged that he was entitled to FMLA leave.

The FMLA entitles employees to leave for various qualifying reasons, including, in relevant part, "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse,

son, daughter, or parent has a serious health condition" and "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(C)–(D). Here, Robles does not claim that he sought leave to care for a family member; rather, he sought leave to cope with the trauma that he experienced because of the death of his girlfriend's daughter. *See* § 2612(a)(1)(C); FAC ¶¶ 26, 28–30. Accordingly, Robles argues that he was entitled to FMLA leave because of his own "serious health condition that ma[de him] unable to perform the functions of [his] position." § 2612(a)(1)(D); *see* Pl.'s Br. 14–15.

The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care in a hospital, hospice, or residential medical care facility; or . . . continuing treatment by a health care provider." § 2611(11); 29 C.F.R. § 825.113(a); *see Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 379 (2d Cir. 2017) (citing FMLA and this Department of Labor regulation). According to Department of Labor regulations, "[i]npatient care means an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care." 29 C.F.R. § 825.114. "[I]ncapacity means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." *Id.* § 825.113(b).

A "serious health condition" that "involves . . . continuing treatment by a health care provider," 29 U.S.C. § 2611(11)(B), includes "[a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition," 29 C.F.R. § 825.115(a). Such a period of incapacity must also "involve[] . . . [t]reatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist," or "[t]reatment by a health care provider on at least one occasion, which

results in a regimen of continuing treatment under the supervision of the health care provider." *Id.*
§ 825.115(a)(1)–(2). Alternatively, a "serious health condition" that involves "continuing
treatment by a health care provider" includes a "period of incapacity or treatment for such
incapacity due to a chronic serious health condition[,]" which itself is defined in detail in the
pertinent regulation. *Id.* § 825.115(c). It also includes a "period of absence to receive multiple
treatments (including any period of recovery therefrom) . . . for . . . [a] condition that would likely
result in a period of incapacity of more than three consecutive, full calendar days in the absence of
medical intervention or treatment[.]" *Id.* § 825.115(e). In sum, in order to constitute a "serious
health condition" under the FMLA, Robles's health condition must have necessitated either
"inpatient care" or "continuing treatment by a health care provider" as defined in detail in the
regulations. 29 U.S.C. § 2611(11); *see Pollard*, 861 F.3d at 379–81 (relying on Department of
Labor regulations in its analysis).

Robles has not alleged sufficient facts to allow me to infer that, at the times that he allegedly
took or wanted to take FMLA leave, he was entitled to such leave. First, despite its conclusory
allegation that the leave that Robles requested on October 27, 2018 "qualified as FMLA leave[,]"
the First Amended Complaint does not set forth any facts that make it plausible that Robles had a
serious health condition at that time. FAC ¶ 30. Robles alleges merely that, on October 27, he
experienced "severe mental health symptoms associated with depression, anxiety, and bi-polar
disorder." *Id.* ¶ 29. He does not allege any facts to support the conclusion that he received inpatient
care—meaning "an overnight stay in a hospital, hospice, or residential medical care facility" or
"any subsequent treatment in connection with" such a stay—at that time. 29 C.F.R. § 825.114. He
also does not allege sufficient facts to make it plausible that he was receiving continuing treatment
by a health care provider on October 27. Although it is plausible that he experienced "[a] period

of incapacity"—in this case, an inability to work because of his health condition, 29 C.F.R. §
825.113(b)—lasting more than three consecutive days, he has alleged no facts to support the
inference that he was receiving any kind of treatment, *id.* § 825.115(a); FAC ¶¶ 29–31; *see also*
29 C.F.R. § 825.115(e). Robles also does not adequately allege that, on October 27, his condition
was "[c]hronic," as at that point he had undergone treatment only once in 2018. 29 C.F.R. §
825.115(c)(1) (defining "[c]hronic serious health condition" as one that requires visits at least
twice per year for treatment); *see* FAC ¶ 23. And, even if Robles had plausibly alleged that he was
entitled to FMLA leave on October 27, he could not state a plausible FMLA interference claim
based on his request for leave on that date because the Hospital granted the request. *See Coutard*,
848 F.3d at 109 (quoting *Graziadio*, 817 F.3d at 424) (listing as necessary element of FMLA
interference claim that plaintiff must have been denied benefits to which he was entitled); FAC ¶
31.

 Second, Robles has not adequately alleged that he was entitled to FMLA leave on
November 5, 2018. In order to be so entitled, Robles must have had a "serious health condition"
that made him "unable to perform the functions of [his] position[.]" 29 U.S.C. § 2612(a)(1)(D).
Here, I find it plausible that Robles had a serious health condition. Robles alleges that he stayed
overnight at the Hospital from November 3 until November 4. *See* FAC ¶¶ 36–37. He also alleges
that, with additional leave beginning on November 5, he "would have been able to treat the
symptoms of his mental health conditions" and that he needed a definite period of leave "to obtain
the necessary treatment for stabilizing his condition[.]" *Id.* ¶¶ 54–55. In fact, he "was subsequently
readmitted to Jamaica Hospital for treatment." *Id.* ¶ 56. Therefore, it is plausible that Robles
needed "subsequent treatment in connection with . . . inpatient care." 29 C.F.R. § 825.114.[9]

---

[9] I do not find it plausible that the "subsequent[]" readmission to the Hospital itself could have

Alternatively, it is plausible that Robles needed "treatment for [an] incapacity due to a chronic serious health condition[,]" as, by November 5, he had had two visits for treatment for his bipolar disorder, his bipolar disorder could plausibly have continued "over an extended period of time[,]" and the symptoms of his bipolar disorder were seemingly "episodic[.]" *Id.* § 825.115(c); *see* FAC ¶¶ 21, 23, 29, 34–37.

However, Robles has alleged no facts that give rise to the inference that he was "unable to perform the functions of [his] position" on November 5. Rather, he makes the conclusory allegation that, if the Hospital had granted him additional leave, the treatment that he would have sought "would have enabled him to return to work and perform the essential functions of his job." FAC ¶ 54. This allegation provides no factual support for the inference that, on November 5, he could not perform the functions of his position. The fact that Robles needed additional treatment does not suffice; it is equally as possible that Robles could have undergone such treatment while still fully performing the functions of his job as it is that he could not have. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."). Therefore, Robles has not plausibly alleged that he was entitled to FMLA leave at any time relevant to the FMLA interference claim.

### iii. The plaintiff has not plausibly alleged that the Hospital had notice of his intention to take leave on November 5, 2018.

Next, in order for an employer to be liable for FMLA interference, it must have had notice of the employee's "intention to take leave[.]" *Coutard*, 848 F.3d at 109 (quoting *Graziadio*, 817 F.3d at 424). "When the approximate timing of the need for leave is not foreseeable, an employee

---

constituted a period of inpatient care that, standing alone, entitled Robles to FMLA leave on November 5 because Robles does not allege that this readmission happened on November 5 or on any other particular date. FAC ¶ 56.

must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). This notice must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request. Depending on the situation, such information may include that . . . the employee . . . has been hospitalized overnight[.]" *Id.* § 825.303(b); *see Coutard*, 848 F.3d at 111.

Here, Robles has not plausibly alleged that the Hospital had the requisite notice of his intention to take FMLA leave on November 5, 2018. First, he has not alleged that, when he requested leave on October 27, he in any way indicated that he intended for such leave to extend beyond November 4. *See* FAC ¶¶ 30–31. Second, he has not adequately alleged that, on November 5, the Hospital had enough information "to reasonably determine whether the FMLA may apply to [his] leave request." 29 C.F.R. § 825.303(b); *Coutard*, 848 F.3d at 111. To begin with, Robles does not allege that he made any "leave request" at all on November 5, or at any time between October 27 and November 5. Rather, he told the human resources representative who fired him "that his supervisors and co-workers knew that he requested leave because of the exa[cerbation] of his mental health symptoms due to the death of his partner's daughter." FAC ¶ 48. Thus, Robles alleges merely that he reminded the human resources representative that he had previously requested leave—presumably referring to the October 27 request—and not that he then, on November 5, was again requesting any additional leave.

Further, Robles does not allege that, absent any express request for leave, the Hospital had enough information "to reasonably determine whether the FMLA may apply" to his circumstances. 29 C.F.R. § 825.303(b); *Coutard*, 848 F.3d at 111. Accepting as true Robles's allegation that his supervisors had access to his medical records or information about the medical care that he received during his overnight hospitalization from November 3 to November 4, *see* FAC ¶ 44,

those supervisors plausibly would have known that he was hospitalized for one night and had already been released on November 5. Thus, although "[d]epending on the situation," the fact that an employee was "hospitalized overnight" might enable an employer to reasonably determine whether the FMLA applies, Robles's was not plausibly such a situation, as he has alleged no facts to support the conclusion that the Hospital should have realized that his November 3–4 hospitalization somehow necessitated additional leave beginning on November 5. 29 C.F.R. § 825.303(b). For example, Robles does not allege that the medical records to which his supervisors had access indicated that he would need time off for additional treatment after his release from the Hospital or that he informed the human resources representative that he needed any such additional treatment. *See* FAC ¶¶ 44–55, 62. Thus, Robles has not adequately alleged that the Hospital had notice of his intention to take leave on November 5, 2018.

### iv. The plaintiff has not plausibly alleged that the Hospital denied him any benefit to which he was entitled under the FMLA.

A plaintiff claiming FMLA interference must show that he "was denied benefits to which [he] was entitled under the FMLA." *Coutard*, 848 F.3d at 109 (quoting *Graziadio*, 817 F.3d at 424). Here, Robles alleges that the Hospital granted the leave that he requested on October 27, 2018. *See* FAC ¶¶ 30–31. Thus, the Hospital did not plausibly deny him any benefit in connection with that request. On November 5, 2018, the Hospital fired Robles. *Id.* ¶ 45. Having concluded that Robles has not sufficiently alleged that the Hospital had notice of his need for additional leave, I cannot reasonably infer that his termination constituted the denial of an FMLA benefit, as the Hospital could not have denied him something that he never requested and that it did not know that he needed. *See Barletta v. Life Quality Motor Sales Inc.*, No. 13-CV-02480 (DLI) (ST), 2016 WL 4742276, at *6 (E.D.N.Y. Sept. 12, 2016) ("Defendants were not on notice that Plaintiff planned to request additional leave for his health condition, and Plaintiff, therefore, cannot

establish that Defendants denied him benefits he never requested in the first place.").

In his brief, Robles argues that the Hospital denied him an FMLA benefit because "before he could finish [his] leave and return to work, he was terminated." Pl.'s Br. 15. Accordingly, he argues, the Hospital "interfered with Plaintiff's full enjoyment of his leave." *Id.* But Robles's own allegations show that he finished the leave that the Hospital granted him: on October 27, 2018, the Hospital granted him leave until November 5. *See* FAC ¶¶ 30–31. On November 5—the first day after his leave ended—the Hospital fired him. *See id.* ¶ 45. Thus, as alleged, the Hospital did not interfere with Robles's full enjoyment of his leave by firing him before he finished it, but rather it fired him after he completed his leave.

Finally, Robles's allegation that, "[u]pon information and belief," the Hospital "never informed [him] of his rights under the FMLA, including his right to medical FMLA leave" does not change my analysis. *Id.* ¶¶ 65, 81. "Failure to notify an employee of FMLA procedures does not, in and of itself, constitute an interference with the exercise of those rights." *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 430 (S.D.N.Y. 2004). That is, "the right to notice under the [A]ct is not an independent right giving rise to suit where failure to notify in no way affected the employee's leave." *Id.* (citing *Sarno*, 183 F.3d at 162). However, "the failure to provide notice that inhibits or restricts an employee from successfully obtaining leave or the right to reinstatement does result in a denial of benefits and can result in a cause of action for interference." *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 363 (S.D.N.Y. 2016) (citing *Sarno*, 183 F.3d at 162). Robles has not alleged how, if at all, the Hospital's failure to notify him of his rights under the FMLA inhibited him from obtaining leave.[10] Therefore, Robles has not plausibly alleged that

---

[10] In fact, it would be difficult for me to find such an allegation plausible, as Robles's allegation that the Hospital never informed him of his FMLA rights is made only "[u]pon information and belief[.]" FAC ¶ 65. If Robles does not know whether or not the Hospital ever notified him of his

the Hospital denied him any benefit to which he was entitled under the FMLA, and he has failed to state a claim for FMLA interference.

Accordingly, the FMLA interference claim is dismissed without prejudice.

**B. The plaintiff has failed to state a claim for FMLA retaliation because he has not adequately alleged that he exercised an FMLA-protected right or that the Hospital acted with retaliatory intent.**

Courts in this circuit analyze FMLA retaliation claims, at the evidentiary stage, under the *McDonnell Douglas* burden-shifting framework. *See Graziadio*, 817 F.3d at 429 (citing *Potenza*, 365 F.3d at 168). In order for a plaintiff to establish a prima facie case in accordance with this framework, he "must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.* (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012)). A plaintiff's "initial burden of establishing a *prima facie* case . . . is 'minimal.'" *Serby v. N.Y.C. Dep't of Educ.*, No. 09–CV–2727 (RRM) (VVP), 2012 WL 928194, at *7 (quoting *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000)). Further, a plaintiff does not need to "plead specific facts establishing a prima facie case of [FMLA retaliation] in order to survive a motion to dismiss." *Ziccarelli v. NYU Hosps. Ctr.*, 247 F. Supp. 3d 438, 448 (S.D.N.Y. 2017) (quoting *Smith v. Westchester County*, 769 F. Supp. 2d 448, 469 (S.D.N.Y. 2011)). Rather, a plaintiff need only plead "facts sufficient to state a claim to relief that is plausible on its face." *Id.* (quoting *Smith*, 769 F. Supp. 2d at 469). Still, I may determine whether the plaintiff has stated a plausible claim by way of reference to the elements of the prima facie case. *See, e.g., Milne v. Navigant Consulting*, No.

---

FMLA rights, it is not clear how he could plausibly claim that he was unable to obtain leave because of this lack of notice.

08 Civ. 8964 (NRB), 2010 WL 4456853, at *10 (S.D.N.Y. Oct. 27, 2010). A plaintiff's burden with respect to the retaliatory intent element is particularly minimal at the pleading stage. *See Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (concluding that complaint alleging Title VII discrimination claim—whose prima facie case has similar elements to that for FMLA retaliation—"need only give plausible support to a minimal inference of discriminatory motivation.").

Here, Robles has not plausibly alleged that he exercised any FMLA-protected right against which the Hospital could have retaliated. Robles argues that the Hospital retaliated against him for "requesting and initiating FMLA leave" by firing him and threatening him with arrest. Pl.'s Br. 17; *see* FAC ¶¶ 30–31, 45, 52. Robles alleges that the leave that he took from October 27 through November 4, 2018 was "FMLA leave[.]" FAC ¶¶ 30–31. However, if Robles had any right to leave under the FMLA during this time period, the allegations allow me to conclude only that such a right would have existed from November 3 until November 4. During those dates, Robles allegedly underwent "[i]npatient care" at the Hospital, which, as discussed above, means that he had a "serious health condition" within the meaning of the FMLA. 29 U.S.C. § 2611(11)(A); 29 C.F.R. § 825.114. Further, I can infer that Robles could not "perform the functions of [his] position" during this hospitalization, as he was receiving treatment after having had a mental breakdown that led to his collapsing in the street. 29 U.S.C. § 2612(a)(1)(D); *see* FAC ¶ 36. Thus, it is plausible that Robles qualified for FMLA leave from November 3 until his release from the Hospital on November 4.[11] However, Robles does not allege that he *exercised* any FMLA-protected right to

---

[11] This conclusion does not change my analysis in Section II.A.ii above, where, in considering the FMLA interference claim, I analyzed whether Robles plausibly alleged that he was entitled to FMLA leave and concluded that he did not. *See Coutard*, 848 F.3d at 109 (quoting *Graziadio*, 817 F.3d at 424). There, the ultimate question was whether the Hospital could plausibly have denied Robles some benefit to which he was entitled under the FMLA. *See id.* Accordingly, I considered

leave at that time. Rather, he was already on the non-FMLA leave that the Hospital had granted him on October 27, and he used that time off to receive treatment for his serious health condition.

Even assuming that Robles did exercise an FMLA-protected right simply by virtue of the fact that his non-FMLA leave became FMLA-protected leave from November 3 to November 4, I cannot reasonably infer that the Hospital retaliated against him for doing so. I reach this conclusion notwithstanding the plaintiff's minimal burden at the pleading stage. That is, I cannot draw even a "minimal inference" of retaliatory intent. *Littlejohn*, 795 F.3d at 311; *Serby*, 2012 WL 928194, at *7 (quoting *Schnabel*, 232 F.3d at 87). Again, Robles has not adequately alleged that, at the time that he began his leave on October 27, he was entitled to leave *under the FMLA*. If he became so entitled, it was on November 3–4, and, as alleged, only then. In order to infer that the Hospital intended to retaliate against Robles for exercising an FMLA-protected right, I would have to conclude that Robles's supervisors granted him non-FMLA leave on October 27, subsequently reviewed Robles's medical records or otherwise learned the details of his November 3–4 hospitalization, *see* FAC ¶ 44, determined that the non-FMLA leave that it had already granted him became FMLA-protected leave on those dates, and decided to fire him and threaten him with arrest because of this transformation. This chain of inferences is purely speculative and borders on nonsensical. It is true that, as Robles argues, "[t]emporal proximity between a plaintiff's exercise of rights created by [the] FMLA and adverse employment action can give rise to an inference of

---

whether Robles was entitled to FMLA leave at the only time that the Hospital could have denied it to him—on November 5. Here, the ultimate question is whether the Hospital could plausibly have retaliated against Robles for having exercised an FMLA-protected right. *See Graziadio*, 817 F.3d at 429 (quoting *Donnelly*, 691 F.3d at 147). In theory, Robles's exercise of such a right could have occurred at any time prior to the alleged retaliatory acts, which themselves occurred on November 5 and thereafter. *See* FAC ¶¶ 45, 52. Thus, it is relevant here—and not with respect to the FMLA interference claim above—whether Robles was entitled to FMLA leave on November 3–4.

retaliation." *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 538 (S.D.N.Y. 2009); Pl.'s Br. 17. However, in this case, it does not. In addition, even if Robles had alleged that he in some way requested additional leave on November 5—which he has not—the Hospital could not plausibly have fired him in retaliation, as the human resources representative told him that he was fired before Robles even mentioned his health condition or the fact that he had previously requested leave. *See* FAC ¶¶ 45–51.

Thus, Robles has failed to state a claim for FMLA retaliation, and it is dismissed without prejudice along with his FMLA interference claim.

### III. The plaintiff's NYSHRL claims for discrimination and failure to accommodate survive, and his NYSHRL claim for retaliation is dismissed as against the Hospital, because I analyze these claims under the same standards as under the ADA.

New York state statutory law makes it unlawful for an employer, "because of an individual's . . . disability, . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." NYSHRL § 296(1)(a). This state statute also makes it "an unlawful discriminatory practice for [an employer] to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." *Id.* § 296(7). The standards for analyzing disability discrimination, failure to accommodate, and retaliation claims under the NYSHRL are the same as the corresponding standards under the ADA. *See Graves I*, 457 F.3d at 184 n.3 (citing *Parker*, 204 F.3d at 332 n.1) (disability discrimination); *Moore v. City of New York*, No. 15-CV-6600 (GBD) (JLC), 2017 WL 35450, at *21 (S.D.N.Y. Jan. 3, 2017) (same), *report and recommendation adopted by* 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017); *Lebowitz v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 158, 175–76 (E.D.N.Y. Mar. 31, 2017) (failure to accommodate); *Lewis v. Erie Cty.*

*Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 352 (W.D.N.Y. 2012) (same); *Hong Yin v. N. Shore LIJ Health Sys.*, 20 F. Supp. 3d 359, 374 (E.D.N.Y. 2014) (retaliation). Therefore, Robles's claims for disability discrimination and failure to accommodate under the NYSHRL survive, and his claim for retaliation in violation of the NYSHRL, as against the Hospital, is dismissed without prejudice.

### IV. The plaintiff's NYCHRL discrimination and retaliation claims survive because the NYCHRL sweeps more broadly than does the ADA.

The NYCHRL makes it unlawful "[f]or an employer . . . because of the . . . disability . . . of any person . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." NYCHRL § 8-107(1)(a)(3). "In contrast to NYSHRL claims, claims under the NYCHRL must be analyzed separately from federal and state law discrimination claims." *Szewczyk v. Saakian*, 774 F. App'x 37, 38 (2d Cir. 2019) (summary order) (citing *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015)). "[T]he NYCHRL has a more liberal pleading standard than its federal or state counterparts," but, still, it "is not a general civility code." *Id.* (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013)).

In order "to 'state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive.'" *Mauze v. CBS Corp.*, 340 F. Supp. 3d 186, 209 (E.D.N.Y. 2018) (quoting *Thomson v. Odyssey House*, No. 14–CV–3857 (MKB), 2015 WL 5561209, at *24 (E.D.N.Y. Sept. 21, 2015), *aff'd*, 652 F. App'x 44 (2d Cir. 2016) (summary order)). However, "[e]ven under this more liberal pleading standard, a plaintiff must plausibly allege that []he was subjected to unequal treatment because of [his] protected characteristic." *Id.* (quoting *Thomson*, 2015 WL 5561209, at *24).

Here, Robles alleges that the Hospital fired him, refused to allow him to speak to anyone besides the human resources representative to explain his medical condition, and subsequently

threatened to arrest him if he returned to the premises. *See* FAC ¶¶ 45–52. The Hospital, in its capacity as Robles's employer, knew about Robles's bipolar disorder when it engaged in these acts. *See id.* ¶¶ 24, 36, 44, 48–49. Thus, Robles has adequately alleged that the Hospital treated him poorly because of his disability. Although Robles does not explicitly allege that the Hospital treated other employees—without disabilities—better than it treated him, I can infer as much, especially given the NYCHRL's liberal pleading standard. Therefore, he has stated a claim for discrimination in violation of the NYCHRL.

In addition, the NYCHRL retaliation claim is broader than the ADA retaliation claim. *See Chauca v. Advantagecare Physicians, P.C.*, No. 18-cv-2516 (BMC), 2019 WL 4247495, at *7 (E.D.N.Y. Sept. 6, 2019) (citing *Mihalik*, 715 F.3d at 109, 112). "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that []he took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Id.* (alteration in original) (quoting *Mihalik*, 715 F.3d at 112).

Here, Robles alleges that the Hospital terminated him, which plausibly could have constituted discrimination. *See* FAC ¶ 45. In response to his termination, Robles asked for an explanation and to speak with his supervisors. *See id.* ¶¶ 46, 50. It is plausible that Robles's asking these questions constituted actions opposing the Hospital's discrimination. The human resources representative refused to allow him to speak with his supervisors, and the Hospital later threatened to have him arrested if he returned to the premises. *See id.* ¶¶ 51, 52. It is plausible that this conduct was reasonably likely to deter an employee from questioning his termination. Robles's allegations are minimal, but, given the NYCHRL's broad sweep, I conclude that he states a claim.

Therefore, Robles has stated claims for NYCHRL discrimination and retaliation, and these

46

claims survive.

### V. The breach of fiduciary duty claim is dismissed as against the Hospital because the plaintiff did not adequately allege that the Hospital's employees acted within the scope of employment or that their conduct was reasonably foreseeable.

"To state a claim for breach of fiduciary duty, [a] plaintiff must allege '(1) the existence of a fiduciary relationship; (2) a knowing breach of a duty that relationship imposes; and (3) damages suffered.'" *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison L.L.P.*, 351 F. App'x 472, 474 (2d Cir. 2009) (summary order) (quoting *Carruthers v. Flaum*, 388 F. Supp. 2d 360, 381 (S.D.N.Y. 2005)). Further, "[u]nder the doctrine of *respondeat superior*, employers, including hospitals and medical corporations, may be held vicariously liable for the wrongful acts of their employees if those acts were within the scope of employment and were committed in furtherance of the employer's business." *Ziccarelli*, 247 F. Supp. 3d at 451 (citing *Doe v. Guthrie Clinic, Ltd.*, 5 N.E.3d 578, 580 (N.Y. 2014)). "The New York Court of Appeals has applied this doctrine in the context of improper disclosure of medical information, holding that, 'a medical corporation's duty of safekeeping a patient's confidential medical information is limited to those risks that are reasonably foreseeable and to actions within the scope of employment.'" *Id.* (quoting *Guthrie Clinic, Ltd.*, 5 N.E.3d at 580).

An employee's conduct was within the scope of employment when the employee acted "at the 'explicit direction of the employer,' or where the employees' actions were a foreseeable, ordinary, and natural incident or attribute of their employment." *Pizzuto v. County of Nassau*, 239 F. Supp. 2d 301, 313 (E.D.N.Y. 2003) (quoting *Schiraldi v. AMPCO Sys. Parking*, 9 F. Supp. 2d 213, 219 (W.D.N.Y. 1998) and citing *Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (1979)). The employer does not need to "have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected." *Id.* (quoting *Riviello*, 391

N.E.2d at 1282). When the employee's act was foreseeable, the employer can be liable as long as the employee acted while the employee was "doing his [employer's] work, no matter how irregularly, or with what disregard of instructions." *Id.* (quoting *Riviello*, 391 N.E.2d at 1281). Still, an employer cannot be liable for an employee's actions that "were not taken in furtherance of the employer's interests and which were undertaken by the employee for wholly personal motives." *Id.* (quoting *Galvani v. Nassau Cty. Police Indemnification Review Bd.*, 674 N.Y.S.2d 690, 694 (N.Y. App. Div. 1998)). Although the assessment of whether an employee acted within the scope of employment "is heavily dependent on factual considerations and is therefore ordinarily a question for the jury[,]" *id.* (citing *Rounds v. Del., Lackawanna & W. R.R. Co.*, 64 N.Y. 129, 137–38 (N.Y. 1876)), a court may dismiss a *respondeat superior* claim at the pleading stage, *see Doe v. Alsaud*, 12 F. Supp. 3d 674, 679 (S.D.N.Y. 2014).

Here, Robles alleges that "the only potential witnesses to" his "verbal altercation" with the nurse "were other care providers at the [H]ospital." FAC ¶ 41. Therefore, his "supervisors could only have been made aware of the verbal altercation through obtaining his records or being directly informed by [medical] staff" members who provided care to Robles *Id.* ¶ 44. In either case, his care providers and his supervisors engaged in "an unauthorized and illegal transfer or access of his confidential medical information." *Id.* Robles then alleges that individual defendants Doe 1–5 and Roe 1–5 "transmitted confidential information pertaining to Plaintiff's treatment for medical and psychiatric conditions to" individual defendants Doe 6–10 and Roe 6–10 "for the purpose of, and with the foreseeable consequence of, using that information as grounds for terminating Plaintiff from his position as a Patient Navigator at Jamaica Hospital." *Id.* ¶ 59. He proceeds to allege that his "termination was a direct, proximate, and foreseeable result of the disclosure of confidential information pertaining to Plaintiff's medical and psychiatric treatment[.]" *Id.* ¶ 60. Accordingly,

he alleges, the Hospital "is liable [on a *respondeat superior* theory] for harm to Plaintiff resulting from actions by [Hospital] employees and agents taken in the course of their employment or agency on behalf of [the Hospital]." *Id.* ¶ 61.

Robles has not adequately pled that the Hospital employees who transmitted his confidential medical information acted within the scope of employment or that the Hospital reasonably could have foreseen their conduct. All of his allegations in this regard are conclusory. *See Chau v. Donovan*, 357 F. Supp. 3d 276, 291–92 (S.D.N.Y. 2019) (dismissing claim premised on *respondeat superior* theory when plaintiff made generalized allegations about foreseeability but did not provide factual allegations in support); *Alsaud*, 12 F. Supp. 3d at 678 ("Plaintiff must plead more than conclusory allegations and present sufficient facts to create a reasonable inference that [the employer's] business included [the employee's conduct]."). Without any factual allegations to support Robles's claims, I find it implausible that Hospital employees transmitted his confidential medical information "for the purpose of . . . using that information as grounds for terminating Plaintiff[.]" *Id.* ¶ 59. It is purely speculative that these unnamed individuals would have violated Robles's confidentiality, on purpose, so that the Hospital could review his medical information and use it as a basis to terminate him. Robles also has not alleged how such a practice constituted part of the Hospital's business. The very concept that the Hospital was in the practice of obtaining the confidential medical information of its employees—who just so happened to also be patients at the Hospital—so that it could review that information and then fire those employees based on their disabilities or medical conditions is quite farfetched. Robles also has not alleged how the Hospital reasonably could have foreseen the conduct of the unnamed individual defendants. In fact, even his conclusory allegations with respect to foreseeability are backwards: Robles seems to allege that the unnamed individual defendants could have foreseen that the

Hospital would use the confidential information with which they provided it as a basis for terminating Robles, and not that the Hospital could have foreseen that its employees would violate patient confidentiality. *See id.* ¶¶ 59–60. Thus, the breach of fiduciary duty claim is dismissed as against the Hospital.

**VI.    Because the plaintiff has not alleged any facts that show that the Hospital knew about its employees' propensities to disclose confidential medical information or identified any training deficiencies, he has failed to state a claim for negligent hiring, training, retention, and/or supervision.**

Under New York law, to state a claim for negligent retention or supervision,

> in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship, (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels.

*Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citations and quotations omitted). The negligent hiring claim also requires that a plaintiff allege "that the 'defendant knew of the employee's propensity to commit the alleged acts or that defendant should have known of such propensity had it conducted an adequate hiring procedure.'" *N.U. ex rel. Amar v. E. Islip Union Free Sch. Dist.*, No. 16-cv-4540 (SJF) (ARL), 2017 WL 10456860, at *16 (E.D.N.Y. Sept. 15, 2017) (quoting *Simpson ex rel. Simpson v. Uniondale Union Free Sch. Dist.*, 702 F. Supp. 2d 122, 135 (E.D.N.Y. 2010)). "In a negligent training claim, the plaintiff must demonstrate deficiencies in the training of employees that, if corrected, could have avoided the alleged harm." *Carter v. Port Authority of New York and New Jersey*, No. 03 Civ. 8751 (DLC), 2004 WL 2978282, at *5 (S.D.N.Y. Dec. 20, 2004).

Here, Robles fails to state a claim for negligent retention, supervision, or hiring because he has alleged no facts to support the inference that the Hospital knew, or should have known, that its employees had a propensity to improperly disclose confidential medical information. Robles

argues that he has alleged that the Hospital "knew or should have known of the propensity of the employees to report an incident that occurred while a staff member was under their care[.]" Pl.'s Br. 21. However, the paragraphs of the First Amended Complaint to which he cites either do not speak of propensity at all, or merely reference foreseeability in a vague and conclusory fashion. *See* FAC ¶¶ 1, 13–14, 40–47, 58–61, 107–11. The First Amended Complaint contains no factual allegations from which I can infer that the Hospital's employees had any particular propensity about which the Hospital knew or should have known.

Nor does the First Amended Complaint identify any training deficiencies. Thus, Robles has failed to state a claim for negligent hiring, training, retention, and/or supervision, and this claim is dismissed without prejudice.

## CONCLUSION

The Hospital's motion to dismiss is denied with respect to the following claims, which survive this opinion: ADA discrimination and failure to accommodate, NYSHRL discrimination and failure to accommodate, and NYCHRL discrimination and retaliation. In addition, all claims as asserted against the individual defendants survive. The Hospital's motion to dismiss is granted with respect to the following claims, which are dismissed without prejudice: ADA retaliation and interference, coercion, and intimidation; FMLA interference and retaliation; NYSHRL retaliation as against the Hospital; breach of fiduciary duty as against the Hospital; and negligent hiring, training, retention, and/or supervision.

Based on the face of the First Amended Complaint, I have serious doubts that Robles can allege the facts necessary to make plausible the claims that I am dismissing. Nonetheless, if Robles is confident that he is able to supply the necessary factual allegations, then he may do so by filing a Second Amended Complaint within ten days from the date of this opinion.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:        June 19, 2020
              Brooklyn, New York